Miller et al. *v.* R. & W. R. R. Co. et al.

MILLER AND KNAPP, *Trustees, v.* THE RUTLAND AND WASHINGTON
RAILROAD COMPANY AND OTHERS.

*Bonds and Bondholders. Mortgage. Coupons. Railroad. Corporation. Payment. Chancery.*

A coupon, payable to bearer, detached from a bond, and owned by one party while the bond is owned by another, is still a lien under the mortgage given to secure the bond.

The coupon, when payable, is a part of the mortgage debt, and an assignment of a portion of the mortgage carries with it, in equity, a corresponding interest in the mortgage security; and the coupon holder, in a foreclosure of the mortgage, is entitled to a *pro rata* distribution with the holders of the residue of the mortgage debt.

The loss of a bond is no objection to its being paid, provided an indemnity is furnished against its being enforced in the hands of others.

Several of the different classes of creditors of the corporation entered into a compromise agreement, the object of which was to wipe out all the debts and securities which existed against it and substitute therefor a third mortgage, under which bonds were to be issued to the creditors for the amount of their debts, respectively, and thus to place all, or substantially all, the creditors on a common footing as to security. *Held,* that a substantial departure from the terms of this agreement, in carrying it out, absolved signers thereto, as in the case of Jacques Guedin, from its obligations, and left them to stand on their original rights under the first mortgage.

Bradley, an officer of the corporation, had transferred two of its bonds to the Bellows Falls Bank as collateral security for a note, and informed Palmer of their situation, and Palmer furnished Bradley with money and authorized him to buy the bonds for him, Palmer, which Bradley did. *Held,* that, under all the facts upon this point, Palmer must be taken to have derived his title by purchase from Bellows Falls Bank. The fact that afterwards there was an agreement between Palmer and Bradley that Bradley, with Palmer's money, should purchase securities for Palmer, and if any profit was made Bradley should have a share of it, even if the arrangement included these bonds, would not necessarily change the character of this transaction.

A court of chancery will uphold a mortgage for the benefit of a party who has advanced money upon it when equity requires it, and it is not indispensable for this purpose that the creditor in the mortgage should be a party to the agreement that the mortgage should be kept on foot.

A court of equity will not convert a payment into a purchase in favor of a party
advancing the money, where there is a superior countervailing equity in another
party.

Bradley advanced money and took up certain coupons on the faith of an agreement,
with the directors of the corporation that he should have the benefit of the
mortgage. *Held,* that he should be protected, as it appears that no superior
equity forbids it.

APPEAL from a *pro forma* decree of the court of chancery, ordered
at the Rutland county court, March Term, 1867, KELLOGG, Chan-
cellor.

The bill in this case was originally brought for a foreclosure of
the first mortgage on the Rutland & Washington Railroad. Answers
and a cross-bill were filed, and voluminous testimony taken; and an
appeal having been taken to the supreme court, a final decree for
foreclosure, &c., in favor of the orators, was then ordered. See the
case as reported, 36 Vt. 452.

Upon the case being remanded to the court of chancery to carry
this decree into effect, it was referred to Royal Tyler, Esq., to report
the amount due under the mortgage. Two successive reports were
made by him, of amounts due and undisputed, upon which no
question now arises. A further hearing was then had before said
master upon certain bonds and coupons presented by Courtlandt
Palmer; certain bonds presented by Jacques Guedin; certain cou-
pons presented by J. Corlies & Co.; certain coupons presented by the
administrators of Jonas Clark, and certain bonds presented condi-
tionally by W. T. Hart.

The allowance of these various bonds and coupons was resisted by
the orators, and by sundry of the defendants in the original cause.
And the allowance of the bonds presented by Mr. Hart was resisted
by the other claimants.

The master having filed his report upon these claims, various
exceptions thereto were filed by the claimants and by the defendants.
A *pro forma* decree was entered by the Chancellor, making a final
disposition of the various claims, and overruling all the exceptions.

From this decree all parties appealed.

The master's report was very voluminous, but the facts pertaining

to the bonds and coupons, to the allowance of which objection was made, are stated in the opinion of the court.

The following is a copy of a coupon on one of the first mortgage bonds:

"The Rutland & Washington Railroad Company will pay the bearer, thirty dollars, at the Mechanics Bank, New York, on the 1st day of January, 1851.

"Bond No. 1. H. CLARK, *Treasurer.*"

*H. E. Stoughton,* for the orators.

*E. J. Phelps* and *George F. Edmunds,* for the defendants.

*L. P. Poland, George Bliss, Jr.,* and *T. D. Hoxie,* for the claimants.

The opinion of the court was delivered by

PECK, J. It having been heretofore decided in this cause that the mortgage, called the first mortage of the Rutland & Washington Railroad Company, to foreclose which this suit is prosecuted, is valid in equity as against the corporation and the subsequent incumbrances, the questions now presented arise upon the master's report, and only affect the amount due upon the mortgage.

The first question arises upon an objection to the allowance of twenty-two coupons presented by Jonas Clark, seven of which were detached from bond No. 125, being coupons due and payable from July 1st, 1855, to July 1st, 1858, inclusive; and the other fifteen detached from bond No. 250, being coupons becoming payable from July 1st, 1855, to July 1st, 1862, inclusive. The two bonds from which these coupons were cut have already been allowed in a former report of the master, but it is not claimed that these coupons were then attached to the bonds, or that they are included in that allowance. It is insisted that when a coupon is detached from the bond and is owned by one party while another owns the bond, it is no longer a lien under the mortgage. The contrary doctrine is well established by authority and was fully recognized in *Sewell* v. *Brainard et al.,* 38

Vt. 364, where the owners of the bond claimed adversely to the holder of the coupon. The corporation can not object on this ground to the allowance of these coupons for the benefit of Clark, as it is indifferent to the mortgagor whether they are allowed to the *coupon* holder or to the holder of the bond. In either case the amount of the entire debt is the same, and the mortgagor owes the entire debt, and the mortgage was executed to secure the *coupons* as well as the bond. The fact that the mortgagors made the *coupons* payable to bearer, shows that such severance of the *coupons* from the bonds was contemplated. The coupon, when payable, is a part of the mortgage debt, and an assignment of a portion of the mortgage debt carries with it, in equity, a corresponding interest in the mortgage security. Nor is this objection available coming from the subsequent mortgagees, for they stand in this respect in the place of the mortgagor, with a right to redeem only by paying the prior mortgage debt, and that debt is not increased by such severance of the *coupons.* Nor can the other bondholders, under the first mortgage, be prejudiced, as these *coupons* have neither been paid, nor have they been allowed to the holders of the two bonds to which they once belonged. But it is claimed that the allowance of these *coupons* will operate as a fraud on Woodbridge, who, as agent for some parties, (for whom it does not appear,) purchased these two bonds of Clark. It appears from the master's report that Clark, before offering these bonds for sale to Woodbridge, detached and retained these coupons ; that Woodbridge made no enquiries, and Clark made no representation in terms with regard to the absence of these coupons at the time of the sale. It does not appear but that Woodbridge, when he received the bonds, received all that he bought. It is true that the master says that Woodbridge was ignorant of the fact that *Clark* had so detached and retained the coupons. But the bonds would show that the *coupons* had been cut off by some one, and the master finds that Woodbridge, as trustee and as counsel and otherwise, had an intimate knowledge of the affairs of the company, and had the means of knowing that the company had paid no coupons payable as late as these, and none later then July 1st, 1854, and that the *coupons* subsequent to July 1st, 1854, were outstanding and unpaid in the hands of some one,

but that he did not suppose Clark *himself* had cut off and retained these coupons. Woodbridge not having purchased the coupons, and knowing, or having the means of knowing, as the master finds, that these coupons were outstanding and unpaid, it was not material to him whether Clark had them, or whether they had been cut off and held by some former owner of the bonds. It is difficult to see how Woodbridge can set up any claim against Clark on account of these coupons. But it is clear that this objection, founded on a mere possibility of a claim on the part of Woodbridge against Clark, for a fraud in that sale, can not be interposed as a valid objection to the allowance of these coupons. It was decided in *Sewall* v. *Brainerd et al.*, that under the circumstances of that case, the holder of the *coupons* had priority over the holder of the bond, in respect to the payment of the dividend in question in that case. But it was said in that case that, if it were " *a final distribution of the proceeds of the whole mortgage property, a pro rata distribution would probably be the rule.*" This suit is of that character, being a foreclosure of the mortgage. All that Clark claims is a *pro rata* distribution with the holders of the residue of the mortgage debt. To this he has a right, and to accomplish this purpose he is entitled to have these *coupons* allowed. This disposes of this particular objection as applicable to all the *coupons*, to which objection is made on this bearing.

Objection is taken to the allowance of the two bonds held by Jacques Guedin, which he held and which were stolen from him in October, 1855, and never heard of in the hands of any one else since. The objection that the bonds are lost and not produced can not prevail, as the claimant offers to furnish an indemnity against the contingency of this being enforced in the hands of any other person. It requires no further proceedings to obviate this objection than to order an indemnity to be furnished within some reasonable time, as the chancellor may direct.

But another objection of a more serious character is interposed. It is claimed that Guedin became a party to the compromise agreement between certain of the creditors and the corporation, and that he is bound to accept the two bonds under the third mortgage, tendered him before the master, in place of his security under this

first mortgage. It appears that about the 31st of July, 1855, the officers of the corporation and the creditors had a meeting, which was somewhat generally attended by the creditors of all classes ; some of whom were secured under the first, and some under the second mortgage, and some not secured at all. The result of this meeting was, that an agreement was drawn up and executed by the corporation and many of the creditors, the object of which was, (and such would be its effect if carried out,) to wipe out all the debts and securities which existed against the corporation, and to substitute therefor a third mortgage, under which bonds were to be issued to the creditors for the amount of their debt respectively, and thus to place all, or substantially all, the creditors on a common footing as to security. With this view, on a careful examination, the debts had been ascertained and found, at that meeting, to amount to $955,000. The creditors not all being present, and not all who were present, having signed the agreement, copies of this agreement, (except the signatures,) were caused to be printed and circulated for the purpose of obtaining the signatures of creditors. Guedin, afterwards, signed one of these copies in the city of New York. This claimant, Guedin, insists that, in carrying out this agreement, there was such a departure from its terms and provisions that he is not bound by it, and not bound to accept bonds under the third mortgage, but is at liberty to stand on his original rights under this first mortgage. The agreement limited the deed of trust or mortgage to be executed, (now called the third mortgage,) to the amount of the debt of the corporation, which amount was at that meeting ascertained to be $955,000. This third mortgage recites that the debt of the corporation amounts to $1,200,000. The vote of the stockholders authorizing the directors to execute this third mortgage, which vote is recited in the mortgage, authorizes the directors to issue bonds under it to an amount not exceeding $1,200,000. The mortgage also recites that under this vote of the stockholders, the directors resolved to issue bonds to the amount of $1,200,000., and secure the same by this mortgage. This excess of a quarter of a million dollars in the amount to be secured by this mortgage, is urged by Guedin as such a departure from the compromise agreement, that he is not bound to

surrender his bonds under the first mortgage, and accept in place of them bonds under this third mortgage. This unexplained, is an objection he has a right to insist on. This mortgage, *prima facie*, is not such a mortgage as is provided for in the compromise agreement. A bond of $1,000., under a mortgage for $1,200,000. on property, is confessedly worth much less than the amount of the mortgage, is of less intrinsic value and worth less in market than the same bond under a mortgage of $955,000. It may perhaps be true that if it was found, after that meeting, that some small amount of debts existed which was accidentally omitted in the computation, the mortgage might have been increased by that amount so as to embrace the whole indebtedness. But the excess is so great as to require explanation. The only explanation to be found in the evidence, is, what is said to be in the testimony of Cowing, the president of the company, to the effect, that the mortgage was thus increased in value to raise funds to enable the company to so construct their road as to form a new connection with another railroad. This is an object foreign to the purpose of the compromise agreement, and not justified by it. It is said that the whole amount of $1,200,000. was not issued under the mortgage ; but the fact that the corporation, by the terms of the mortgage, had a right to fill it up to that amount would lessen the market value of the bonds. Again, the compromise agreement provides that the bonds to be received by the creditors shall be in full discharge of all their existing debts and securities ; while in carrying out this agreement, the creditors, in order to obtain bonds under this third mortgage, were required to assign their existing claims to the trustees named in the mortgage, for the benefit of the trust. There are other particulars not necessary to detail, in which it is claimed that the compromise agreement was not complied with. We are all agreed that there was such a departure on the part of the corporation and those who came in and took bonds under it, that they can not compel Guedin to accept bonds under the third mortgage, and abandon his security under the first mortgage. It is sought to bind this claimant by a subsequent ratification ; but we find no such ratification with notice of the wide departure from the provisions of the original compromise agreement as will bind him.

Courtlandt Palmer presented nine bonds and three hundred and seventy-eight coupons. . Two of these bonds were . originally issued to John Bradley and Canfield, in payment of freight on iron. John Bradley transferred them as collateral security to the Bellows Falls Bank, and the bank transferred them to Palmer. Bradley signed the compromise agreement; and it is objected to these bonds that Bradley owned them when he signed the compromise agreement. The master finds that Bradley did not own them at that time. It is insisted that that finding is against the evidence. The master reports that the fact that Bradley owned the bonds before and after he signed the compromise agreement, unexplained, raises a presumption that he owned them at the time he so signed. This is a sensible conclusion. When a fact, continuous in its nature, is shown to exist, its continuance is presumed till the fact appears otherwise, either by circumstances raising a counter presumption, or by direct evidence. But, in this case, the master reports that John Bradley testified that he did not own these bonds when he signed that agreement, and that he so finds the fact. We are satisfied with this finding. But it is insisted further that the transaction, by which Palmer acquired his title to these two bonds, was a payment by Bradley to the Bellows Falls Bank, and a purchase of the bonds by Palmer of Bradley. It is true that Bradley informed Palmer of the situation of the bonds, and Palmer furnished Bradley with the money and authorized him to buy the bonds for him, Palmer, and Bradley did so. Under this finding Palmer must be taken to have derived his title by purchase from the Bellows Falls Bank and not from Bradley. The fact that afterwards there was an agreement between Palmer and Bradley that Bradley, with the money of Palmer, should purchase securities for Palmer, and if any profit was made Bradley should have a share of it, even if the arrangement included these bonds, would not *necessarily* change the character of this transaction; although it might, as evidence, have some bearing upon the question of fact as to what the real character of it was. Upon the facts found by the master, we cannot say it was a loan of the money by Palmer to Bradley, and a purchase of the bonds of Bradley. These bonds must be allowed. The other seven bonds presented by Palmer

are parcel of a lot of twenty-five bonds in reference to which it is insisted that they were made and signed, but never issued by the corporation. This is mainly a question of fact which the master leaves to the court to find or decide. From the vote of the stockholders, and votes and action of the directors, and the general understanding on the subject that existed among the directors and certain persons who were endorsers for the corporation, and the fact that the corporation paid the coupons on some of them, we think those twenty-five bonds were appropriated to indemnify these endorsers, so as to amount to an issue of the bonds. Merritt Clark, of whom Palmer purchased these bonds, was one of these endorsers, and from him Palmer obtained a good title. These bonds should be allowed. It is objected that the money used by Clark to get possession of these bonds is a bar to their allowance; but we think the facts reported are not sufficient to warrant that conclusion; besides, Clark had previously acquired an equitable interest in the twenty-five bonds, and his obtaining possession of the seven of them in question, was only reducing to possession securities in which he had already an equitable interest.

The detached coupons presented by Palmer are found by the master to be due and unpaid, unless, as to all but eighteen of them, the manner in which they were acquired by Bradley, amounts to a payment in equity. As to the eighteen, they should unquestionably be allowed. As to the residue of them, it appears that about the time they became payable, the corporation was unable to raise the money to pay them, and an agreement was made between Bradley and the directors, the result of which was, that Bradley agreed to deposit his own money in the Mechanics Bank, in New York, and with it take up the *coupons* and hold them, under the mortgage, as his security. This Bradley did accordingly, informing the clerk in the bank, who was charged with the duty of paying coupons, when he deposited the money, that he wanted the coupons kept by the bank uncancelled, and given to him when he should call for them. Before doing this, Bradley, with the knowledge and approbation of the directors, consulted counsel and came to the conclusion that he could thus take up the coupons and hold them with the mortgage security unaffected.

A court of chancery will uphold a mortgage for the benefit of a party who has advanced money upon it when equity requires it. It is not indispensable for this purpose that the creditor in the mortgage should have been a party to the agreement that the mortgage should be kept on foot. It is often done where there is no agreement at all to that effect, but where all parties at the time the money is paid intend it as a payment and satisfaction of the mortgage. But a court of equity will not convert a payment into a purchase in favor of a party advancing the money when there is a superior countervailing equity in another party. As Bradley took up these *coupons* on the faith of an agreement that he should have the benefit of the mortgage, he should be protected unless some superior equity forbids it. The corporation cannot object in the face of their agreement. The third mortgage bondholders cannot object, for these *coupons* are a part of the original mortgage debt under this prior mortgage. If it appeared that Bradley represented to them, when they took their mortgage, that the coupons were paid, the case might be different. The third mortgagees are in no worse condition if these coupons are allowed as now presented, than if they still remained unpaid attached to the bonds ; neither are the first mortgagees, so far as it appears. But it is said, that these *coupons* being taken up in the manner they were, the bondholders under the first mortgage had a right to suppose it was a payment, and may have thereby been induced to postpone proceedings to foreclose their mortgage. This is a mere conjecture. It may be so and may not. But whether it is or not, if this mortgage is redeemed, it is no prejudice to them to have these *coupons* allowed, as they will get their whole debt. It cannot be assumed that it will not be redeemed. But if it is not redeemed, it does not appear, nor is it claimed in argument, that the property is insufficient in value to pay the whole of this first mortgage debt, including these coupons ; so that in either event the first mortgage bondholders will receive their whole pay. No equity should be crowded out when there is enough to pay all. This will not be done even in case of a subsequent lien ; much less against a party who holds a part of the original first mortgage debt. But it is insisted that the allowance of these coupons interferes with the *chance* of the first mortgage

bondholders obtaining this property by foreclosure for less than its value. That is a chance that must be postponed till all equitable liens are discharged. It cannot be allowed to stand in the way of an equity so obvious as this. A mortgagee who wishes to speculate out of the mortgage security by getting more than his full pay, at the sacrifice of a holder of a part of the mortgage debt, must do it without the aid of a court of equity. Palmer, holding these coupons from Bradley, is entitled to have them allowed. The $1,950. claimed to have been paid to Bradley on these coupons was properly disposed of by the master as not having been paid on these coupons. Nor can the $900. found due from Bradley to the company, on settlement in 1856, after Palmer had purchased these coupons, be deducted. It has no connection with these coupons.

The two hundred and twenty coupons presented by Corlies, it is conceded by counsel, were property disallowed by the master.

The eighteen bonds presented by Hart can not be allowed. It appears that these eighteen bonds are a part of the lot of twenty-five before referred to. It is not claimed that they can properly be allowed, but it is insisted that if the seven presented by Palmer are allowed, these should be. These eighteen bonds, while in the hands of Canfield, were valid for the same reason assigned for the validity of the seven, as Canfield was one of the endorsers for whose benefit the twenty-five bonds were appropriated. Canfield delivered them to the trustees of the third mortgage on their indemnifying him against his endorsements for the corporation. It appears that there was an auction sale of certain property held by the trustees of the third mortgage, in the State of New York, and that Hart bid off the property. The trustees of the third mortgage delivered these bonds to Hart, for the reason that they supposed at the time, that these bonds were embraced in that sale to Hart; but it was not claimed before the master, nor is it claimed here, that Hart is entitled to have these bonds allowed in virtue of any right he acquired by that purchase in New York. But the counsel, who represents these bonds, claims if any of the twenty-five bonds are allowed these eighteen should be also, and vest Hart's right to have them allowed, solely on the ground that he is the *bearer* by virtue of

27

the delivery to him by the trustees of the third mortgage under the circumstances already stated. The master does not find that Hart acquired any title to them by the sale in New York. Thus it appears that Hart never purchased these bonds or paid any thing for them, and they should be disallowed. Hart also presents twenty-one other bonds. His title to those rests on no better foundation than his title to the eighteen before mentioned, and they were delivered to him by the trustees of the third mortgage under the same circumstances. These are bonds delivered up by parties who held them and who came in under the compromise agreement and took bonds under the third mortgage for the same debt. We see no right in Hart to have these bonds allowed, and they must be disallowed.

The decree of the chancellor is reversed and cause remanded, with a mandate to the court of chancery to so modify the decree that it may conform to the foregoing decision.